United States District Court
for the
Southern District of Florida

| | |
|---|---|
| United States of America | ) |
| | ) |
| v. | ) Criminal Case No. 20-20138 |
| | ) |
| Thomas Daniels, Defendant | ) |

### **Omnibus Order on Pre-trial Motions**

Before the Court are four motions filed by Defendant Thomas Daniels. ***First***, in his motion to sever (ECF No. 70), Daniels asks the Court to sever count II of the Superseding Indictment. ***Second***, in his motion in limine to limit the testimony of lay witnesses (ECF No. 72), Daniels seeks to prevent law enforcement witnesses from identifying Daniels as the perpetrator depicted in a surveillance video. ***Third***, in his motion in limine to exclude records (ECF No. 75), Daniels argues that the Government should be prevented from introducing records from the Florida Department of Highway Safety and Motor Vehicles ("FDHSMV"). ***Last***, in his motion to suppress and exclude (ECF No. 78), Daniels seeks to (i) exclude four photographs taken during an allegedly illegal seizure, as well as bar introduction of identifications predicated on the illegally secured photographs, (ii) exclude identifications based on an allegedly unduly suggestive photographic line-up, and (iii) exclude evidence obtained from an alleged warrantless search of a cell phone. The Government opposed each motion. (ECF Nos. 88, 89, 92, 93.) On March 25, 2022, the Court held an evidentiary hearing on the motions. After careful review of the parties' briefing, the record, the credible testimony and evidence, arguments presented at the hearing, and the relevant legal authorities, the Court **grants** the Defendant's motion to sever (**ECF No. 70**), **denies** the Defendant's motion in limine to limit lay witness identification testimony (**ECF No. 72**), **denies** the Defendant's motion in limine to exclude FDHSMV records (**ECF No. 75**), and **denies** the Defendant's motion to suppress and exclude (**ECF No. 78**).

1. **Background from the Parties' Briefing**

On February 14, 2020, a man—identifiable by surveillance video as a thin-built black man wearing a hooded sweater with white drawstrings and emblazoned with a "U.S. Polo Horse" symbol—walked up to a car parked outside a tow yard and tried to open the door. Discovering that the car was locked, the man walked into the tow yard, approached two victims (O.R. and R.P.), and brandished a firearm. The man shot O.R. and took his necklace, bracelet, and cell phone. Next, the man shot R.P., who was fleeing, and took

his car keys, wallet, and necklace. The man then fled in the car parked outside.

Police responded to the scene. R.P. described the perpetrator as a thin-built black man between 130 and 160 pounds, 5'6" and 6'00" in height, and 25 to 35 years old. While searching the crime scene, police found a cell phone. After determining that the cell phone did not belong to either victim, police accessed the phone—which was not password protected—and reviewed text messages and photographs. Reviewing this data, police connected the cell phone to Excellent Saintal, who later identified Daniels in a photographic line-up and reported that he had let Daniels borrow his cell phone. Two days after the shooting, police obtained a warrant to search the cell phone.

Meanwhile, on February 15, 2020, a man, who provided a driver's license identifying himself as Thomas Daniels, pawned a gold necklace and bracelet in exchange for $1,500. O.R. later identified this necklace and bracelet as his property that had been stolen.

Two days later, on February 17, 2020, Detective Wilson—who already suspected Daniels in the carjacking and shooting—encountered Daniels at a grocery store in Homestead. Daniels was wearing the same hooded sweater identifiable in the surveillance video. Detective Wilson identified himself as an officer investigating a domestic incident and asked Daniels to exit the store with him. Once outside and in public, Detective Wilson informed Daniels that he resembled the suspect in this domestic incident. Telling Daniels that he wanted to confirm whether Daniels was the suspect in the alleged domestic incident, Detective Wilson asked Daniels if he could take photographs and see his identification. After complying with Detective Wilson's requests, Daniels left.

Using these up-to-date photographs of Daniels, police showed O.R. a new photographic line-up the next day. While O.R. had been unable to identify the perpetrator in an earlier photographic line-up, O.R. now identified Daniels. On February 20, 2020, a criminal complaint and federal arrest warrant were issued. On March 3, 2020, Daniels was arrested at an apartment complex after officers found him hiding behind a washer and dryer.

2. **Summary of Testimony**

   a. **Detective Christopher Wilson**

Wilson has been a detective with the Homestead Police Department for five years. He was previously a police officer for Florida City for 8 years.

Wilson knows Daniels from patrolling the streets of Florida City. Wilson has spoken with Daniels seven to ten times. None of those conversations involved investigations of crimes. Wilson was a uniformed officer at the time

and always tried to engage with members of the community. Wilson has also seen Daniels in the community numerous additional times, none of which involved any allegations of criminal activity. He first saw Daniels in approximately 2012.

Wilson has not arrested Daniels in the past.

Wilson was able to identify the Defendant in the courtroom.

On February 16, 2020, Wilson was shown a video of a shooting that had occurred on February 14, 2020, and Wilson was able to recognize Daniels as the shooter. Wilson claims he was 100% certain of the identification.

Wilson was asked by Detective Mata to try to obtain an updated photo of Daniels. Wilson had seen the photos of Daniels that Homestead police had available and he did not now look like his images depicted in the photos. Wilson went to look for Daniels to obtain an up-to-date photo of Daniels. Wilson was shown a photo lineup in which Daniels's photo was in the number five position, but that photo was an older photo did not look like Daniels at the time.

On February 17, 2020, Wilson went into the M & M Food Market, a grocery store in Daniels's neighborhood. Wilson was in uniform and was armed. Wilson said, "look, I need to talk to you. Do you want to do it in the store or outside?" Daniels agreed to go outside.

Once outside the store, Wilson told Daniels that he was a suspect in a domestic incident involving a battery and asked if he could take his photo. Wilson also asked to see Daniels's ID and was shown a Florida ID with the name "Thomas Daniels." Daniels said he knew he was not involved in a domestic dispute, so he agreed to have his photo taken. Wilson took four photos of Daniels while he was standing outside the store. The entire encounter took four to five minutes.

Wilson believes one of the photos he took was used in a photo lineup that was shown that same day.

An LG phone was found on the scene of the robbery. Both victims told police the phone was not theirs. Wilson was asked to take a photo of the phone while it was in the property room so another detective could show the phone to the victims.

Excellent Santail's photos were on the LG phone and he had some other connection to the phone. Wilson went to look for Santail and left his business card with Santail's mother and asked her to have Santail contact him. Santail contacted Wilson twenty minutes later and Santail agreed to come to the police station. Santail spoke with Mata and Fuste in the general investigative unit of the Homestead Police Department. Wilson later learned a photo lineup had been shown to Santail.

In court, Wilson was shown the DAVID photo of Daniels taken January 28, 2020, and compared it to the photo Wilson took. Although the photos appear to be the same person, the hair and neck structure of Daniels in the two photos are different.

### b. Sergeant George Reyes

Reyes is in charge of the General Investigations Unit for the Homestead Police Department. Reyes was asked by Detective Fuste to show a photo lineup to both victims at the hospital. Reyes showed victim Perez a lineup on February 16, 2020. Reyes did not know which of the six photos was the suspect in the case. Perez did not make an identification. Perez said it was between picture three and picture five, but he could not make an identification.

On February 17, 2020, Reyes showed a different photo lineup to victim Roman at the hospital. Roman pointed at photo three and said, "that's the person who robbed me. Get that motherf---er." Reyes did not show Roman the lineup the day before because he was not alert.

Reyes was not working on February 14, 2020 and was not involved in the investigation except for showing the photo lineup.

Reyes was not involved in any 'show-ups' and did not interview any witnesses. Reyes did not know what descriptions of the shooter had been given to the police. Reyes did not prepare either lineup and does not know how the lineups were prepared.

Reyes does not know if other officers had spoken to the victims at the hospital.

Reyes did not watch the videos in the case and did not know that the suspect was wearing a hoodie.

Reyes showed another lineup to Isaac Dean at the police station on February 16, 2020. Dean circled photo number 4.

### c. David Mata

Mata is a detective with the Homestead Police Department and is also a task force officer with ATF. Mata was told on February 15, 2020 to assist Detective Fuste in an armed robbery in which shots were fired.

On February 17, 2020, Mata reached out to Miami-Dade County to learn if Daniels had pawned any items recently. Mata learned Daniels had pawned jewelry at a pawn shop. Daniels's name, DOB, driver's license and thumbprint are provided to the pawn shop. Pawn shops are required by law to input data of items pawned on a database accessible to the police. Mata received the video of Daniels pawning the jewelry and took photos of the jewelry that was pawned.

Mata went to the hospital after he went to the pawn shop but does not know if he went directly there. Mata showed Roman photos of the jewelry but did not show him the video from the pawn shop. Fuste spoke with Roman about the incident. Mata was not present the entire time.

Roman said he was at the tow yard with his partner, they got into an altercation with each other, a black male entered the yard and robbed and shot him, and he played dead after he was shot.

When they left the hospital, Mata called his lieutenant, Barker, to notify him that the jewelry had been identified by the victim.

Withing a couple of days of the robbery, Wilson told Mata that he had positively identified Daniels from the video, but Mata still needed to conduct a full investigation, collect evidence and take all necessary steps before an arrest is made. Mata recommended to Fuste to create a lineup and present to the victims. Fuste prepared the lineups, but Mata does not know how the lineups were prepared.

Mata prepared two search warrants to track each victim's phones and another warrant to search the phone that was found on the scene. He is not sure if he was involved in preparing the search warrant for Kathleen Dean's house.

### 3. Discussion

In all, Daniels filed a (1) motion to sever, (2) motion in limine to limit lay witness identification testimony, (3) motion in limine to exclude FDHSMV records, and (4) motion to suppress and exclude. (ECF Nos. 70, 72, 75, 78.) The Court will address each motion separately.

#### A. Motion to Sever.

Courts undertake a two-step inquiry to determine whether criminal charges are properly tried together. *See U.S. v. Montes-Cardenas*, 746 F.2d 771, 776 (11th Cir. 1984). First, the Government bears the burden of demonstrating that the initial joinder of the offenses was proper under Federal Rule of Criminal Procedure 8. *See id.* Second, courts must determine whether a severance is warranted under Federal Rule of Criminal Procedure 14. *See id.*

An indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." *See* Fed. R. Cim. P. 8(a). Rule 8 is "broadly construed in favor of the initial joinder." *See U.S. v. Dominguez*, 226 F.3d 1235, 1238 (11th Cir. 2000) (quoting *U.S. v. Weaver*, 905 F.2d 1466, 1476–77 (11th Cir. 1990)). If the initial joinder was warranted, courts will grant

a severance only if joinder will result in "specific and compelling prejudice" to the defendant. *See U.S. v. Liss*, 265 F.3d 1220, 1228 (11th Cir. 2001) (citing *U.S. v. Walker*, 720 F.2d 1527, 1533 (11th Cir. 1983)).

Daniels argues that count II for possession of ammunition by a convicted felon should be severed, as introduction of his prior felony conviction would be unduly prejudicial and encourage the jury to engage in propensity reasoning. (ECF No. 70.) The Government opposes the motion, arguing that initial joinder was appropriate under Rule 8(a), as the charges all arise from the same conduct that occurred on February 14, 2020, when Daniels allegedly possessed ammunition and discharged a firearm in connection with the carjacking. (ECF No. 88 at 5.) The Government further argues that joinder promotes judicial economy, as severance would require the Government to produce largely the same witnesses and evidence at a second trial. (*Id.* at 6.) Last, the Government contends that any prejudice would be minimized as the Defendant has agreed to stipulate to his status as a convicted felon, the Court could instruct the jury to disregard the prior convictions when addressing the remaining counts, and the Government does not intend to focus on Daniels's prior convictions in its presentation. (*Id.* at 8–9.)

The Court finds that introduction of Daniels's status as a convicted felon would be unduly prejudicial under the facts of this case. Moreover, the Court finds that this prejudice would not be dispelled by a joint stipulation as to his prior conviction. Rather than sever the count for a separate trial, the court will bifurcate the trial. The jurors will decide the Defendant's guilt or innocence on Counts II and IV and, irrespective of its verdict on those counts, a brief second trial phase will take place during which both sides may put on additional evidence. The Defendant has agreed to stipulate to the fact he is a convicted felon and knew he was a convicted felon as of the date of the incident. For these reasons, the Court **grants in part** the motion. (**ECF No. 70**.)

### B. Motions in Limine.

A motion in limine is made before a trial has begun for the purpose of excluding or including certain evidence. *See* 20 Am. Jur. Trials 441 § 2 (1973). Because of concerns of "fairness to the parties and their ability to put on their case," courts often defer evidentiary rulings until trial, at which time such objections can be "resolved in proper context." *See U.S. v. Gonzalez*, 718 F. Supp. 2d 1341, 1345 (S.D. Fla. 2010) (citing *In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769, 2009 WL 260989, at *1 (M.D. Fla. Feb. 4, 2009)). Therefore, courts should only exclude evidence in limine when the movant establishes that the evidence is "clearly inadmissible on all potential grounds." *See Gonzalez*, 718 F. Supp. 2d at 1345 (referring to this as a "high standard").

Daniels filed two motions in limine. First, Daniels seeks to prevent law enforcement witnesses from offering lay witness identification testimony. (ECF No. 72.) Second, Daniels seeks to exclude various FDHSMV records as irrelevant. (ECF No. 75.) The Court will address each motion in turn.

### *1. Motion in Limine to Limit Identification Testimony*

In his first motion in limine, Daniels seeks to prevent law enforcement officers from testifying that Daniels is depicted in the surveillance video. Daniels argues that such evidence would be unduly prejudicial under Rule 403 and that the identity of the individual in the surveillance video is a factual question for the jury under Rule 701. (ECF No. 72.) The Government responds that Detective Wilson's identification testimony is admissible under Rule 701, as Detective Wilson knows Daniels and has familiarity with his appearance. (ECF No. 93 at 2.) Moreover, the Government argues that there would be no prejudice, as Detective Wilson's familiarity with Daniels arises not from Daniels's "past exposure to the criminal justice system," but from past "encounters" between Daniels and Detective Wilson that "were not criminal in nature." (*Id.*)

Federal Rule of Evidence 701 permits opinion testimony from a lay witness where the witness's opinions are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed. R. Evid. 701. A lay witness's identification of a defendant in a surveillance video depends on a "number of factors," such as whether the witness was familiar with the defendant's appearance at the time of the crime and whether the defendant altered their appearance or disguised themselves at the time of the crime. *See U.S. v. Pierce*, 136 F.3d 770, 774–75 (11th Cir. 1998). But courts have held that "most critical to this determination is the witness's level of familiarity with the defendant's appearance." *See id.* at 774.

Federal Rule of Evidence 403 permits the exclusion of otherwise admissible evidence where its "probative value is substantially outweighed by the danger of unfair prejudice." *See* Fed. R. Evid. 403. While lay witness identification testimony may be admissible under Rule 701, "courts have nevertheless recognized the danger of unfair prejudice that arises when the source of such testimony is a police, probation, or parole officer." *See Pierce*, 136 F.3d at 775; *see also U.S. v. Knowles*, 889 F.3d 1251, 1257 (11th Cir. 2018) (discussing *Pierce*, 136 F.3d at 775–76). Such testimony could "highlight[] the defendant's prior contact with the criminal justice system." *See Pierce*, 136 F.3d at 776. Therefore, the Eleventh Circuit has cautioned that courts should admit lay witness identification testimony from a law

enforcement officer "only in limited and necessary circumstances with all appropriate safeguards." *See id.*; *see also Knowles*, 889 F.3d at 1257 (noting that "a police officer's identification testimony is [not] *ipso facto* unduly prejudicial" and finding that the trial court did not err in admitting an officer's identification testimony that was based on the officer's observations during the crime rather than previous encounters).

Here, the Court finds that it would not be unduly prejudicial for Detective Wilson to proffer lay witness identification testimony that Daniels is the individual depicted in the surveillance video. Wilson's contacts with Daniels were clearly unrelated to Daniels's past arrest history. Wilson has never arrested Daniels. Under these circumstances, there is no reasonable possibility that jurors could infer or even speculate that Daniels has a criminal record.

Given the heightened potential for prejudice, courts often will only permit a law enforcement witness to give identification testimony where "such persons are the only source of adequate identification testimony." *See Pierce*, 136 F.3d at 776 (citing *U.S. v. Farnsworth*, 729 F.2d 1158, 1161 (8th Cir. 1984); *U.S. v. Butcher*, 557 F.2d 666, 670 (11th Cir. 1998)). Here, there are problems with the strength of the identifications made by the two victims. Therefore, the risk of undue prejudice is substantially outweighed by the probative value that would accompany Detective Wilson's identification testimony.

For these reasons, the Court **denies** the motion in limine to limit law enforcement identification testimony. (**ECF No. 72**.)

### *2. Motion in Limine to Exclude FDHSMV Records*

In his second motion in limine, Daniels seeks to exclude photographic FDHSMV records of Daniels from 2015 to January 2020, arguing that such records are irrelevant and prejudicial under Rules 401 and 403, respectively. (ECF No. 75.) The Government counters that such records are relevant, as the Government seeks to admit Daniels's driver's license records to establish that his name, address, and driver's license number match those allegedly given to the pawn shop. (ECF No. 89 at 3.) Additionally, the Government argues that the driver's licenses will provide near-contemporaneous photographs of the Defendant at the time of the carjacking. (*Id.*) Therefore, the Government argues that the probative value of this evidence is not substantially outweighed by any danger of unfair prejudice.

Federal Rule of Evidence 401 provides that any evidence, tending to make the existence of any fact of consequence more probable or less probable, is relevant and admissible. *See* Fed. R. Evid. 401, 402. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the

jury[.]" *See* Fed. R. Evid. 403.

Here, the Court finds that the FDHSMV records are relevant and not unduly prejudicial. The records meet the low threshold for relevance, as the Government seeks to establish that the name, address, and driver's license number allegedly given by Daniels to the pawn shop were, in fact, his name, address, and driver's license number. Moreover, the probative value of this evidence is not substantially outweighed by any prejudice. The only prejudice that Daniels argues is that the records would confuse and mislead the jury because of their irrelevance. However, as the Court has found that the records are relevant, there is no basis to find that the records are unduly prejudicial. Therefore, the Court **denies** the motion. (**ECF No. 75**.)

### C. Motion to Suppress and Exclude.

Daniels's motion to suppress and exclude argued: (1) that Detective Wilson's encounter with Daniels on February 17, 2020, constituted a warrantless seizure and that all evidence arising from that seizure, as well as out-of-court and in-court identifications premised on photographs taken during the seizure, must be suppressed; (2) that the photographic line-up given to O.R. on February 17, 2020, was unduly suggestive; and (3) that police unlawfully conducted a warrantless search of a cell phone found at the crime scene. The Court will address each argument in turn.

#### *1. Seizure*

The Fourth Amendment protects "[t]he right of the people . . . against unreasonable searches and seizures." U.S. const. amend. IV. A warrantless search or seizure is "presumptively unreasonable." *See U.S. v. Berrong*, 712 F.2d 1370, 1372 (11th Cir. 1983). However, "not all personal intercourse between policemen and citizens involves 'seizures' of persons[.]" *See Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). Therefore, courts have classified encounters between police and citizens into three categories, each with a different inquiry under the Fourth Amendment: "(1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions [*Terry* stops]; and (3) full-scale arrests." *See U.S. v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011) (quoting *U.S. v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006)).

Determining whether a seizure occurred is an objective standard, and courts hold that a person has been seized "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *See U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980). In determining whether one would feel free to leave, courts consider factors such as "the threatening presence of several officers, the

display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone indicating that compliance with the officer's request might be compelled." *See id.*; *see also U.S. v. Knights*, 989 F.3d 1281, 1286 (11th Cir. 2021).

Here, Daniels argues that he was impermissibly seized when Detective Wilson asked him to leave a store, pose for four photographs, and briefly display his identification. (ECF No. 78 at 9–10.) The Government argues that Detective Wilson—who was alone—did not order Daniels to comply with his requests, did not display or remove a weapon, and did not physically touch or block Daniels. (ECF No. 92 at 4–5.) Alternatively, the Government argues that even if Daniels was briefly seized, Detective Wilson had reasonable suspicion to stop him, as Detective Wilson believed that Daniels was the individual depicted in the surveillance video and wanted for armed carjacking. (*Id.* at 5–6.)

Regardless of whether Daniels was seized, the Court finds that the warrantless stop was lawful as Detective Wilson had reasonable suspicion. To determine whether reasonable suspicion existed, courts look to whether "the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate." *U.S. v. Franklin*, 323 F.3d 1298, 1301 (11th Cir. 2003). Reasonable suspicion needs more than an "inchoate hunch" and requires officers to "articulate some minimal, objective justification[.]" *See U.S. v. Boyce*, 351 F.3d 1102, 1107 (11th Cir. 2003) (cleaned up); *see also Terry*, 392 U.S. at 27 ("[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.").

The only basis for reasonable suspicion offered by the Government is that Detective Wilson had identified Daniels as a suspect in the carjacking and shootings. This is enough to satisfy reasonable suspicion. *See U.S. v. Hensley*, 469 U.S. 221, 229 (1985) (holding that law enforcement may conduct stops if the officers have "a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony").

Here, Detective Wilson has specific and articulable facts to reasonably suspect Daniels. Detective Wilson had previously reviewed the surveillance video and believed that Daniels, based on his familiarity with Daniels's appearance, was the perpetrator in the carjacking. Moreover, Daniels was wearing the same hooded sweater at the grocery store when stopped by Detective Wilson as he allegedly wore during the carjacking. These articulable facts are sufficient to confer not only reasonable suspicion but probable cause.

Therefore, as the Court finds that Detective Wilson had reasonable suspicion and probable cause that Daniels was involved in a completed felony when he stopped Daniels on February 17, 2020, the Court **denies** the motion to suppress. (**ECF No. 78**.)

### *2. Unduly Suggestive Line-up*

Next, Daniels argues that the victim O.R. was shown an unduly suggestive line-up on February 17, 2020, and that his out-of-court and in-court identifications should be excluded. Courts follow two steps to determine if an out-of-court identification is improper: (1) whether the original identification procedure was "unduly suggestive", and (2) if so, whether the "identification was nonetheless reliable." *See U.S. v. Perkins*, 787 F.3d 1329, 1344 (11th Cir. 2015) (quoting *U.S. v. Brown*, 441 F.3d 1330, 1350 (11th Cir. 2006)). To determine whether a photographic line up was "unduly suggestive," courts look to the totality of the circumstances, including "the size of the array, the manner of its presentation, and the details of the photographs in the array." *See id.*

Daniels contends that the photographic line-up was unduly suggestive as Daniels was the only one depicted with dreadlocks and wearing a hooded sweater with white drawstrings. (ECF No. 78 at 11–12.) Moreover, Daniels argues that the police showed O.R. surveillance pictures and videos from the incident before producing the line-up, therefore improperly "creat[ing] a mental image in [O.R.'s] mind of the perpetrator."[1] (*Id.* at 11.)

The Court finds that the line-up was not unduly suggestive. The line-up appears to depict six men with similar skin tones and dreadlocks of varying length and size. (ECF No. 92-1.) Only a small portion of the men's upper body clothing is visible in the photographs. (*Id.*) Two men appear to be wearing a hooded sweater, and two men are wearing sweaters with white drawstrings. (*Id.*) The fact that the individuals in the line-up are not wearing uniform clothing does not render it unduly suggestive. *See Perkins*, 787 F.3d at 1344 (holding that the lower court did not clearly err in finding that a line-up, where the defendant was the only one with gold teeth, was not unduly suggestive). Moreover, small differences in the men's hair and skin tone do not render the line-up unduly suggestive. *See U.S. v. Anderson*, 156 F. App'x 218, 220–21 (11th Cir. 2005) (holding that the district court did not err, as the line-up contained individuals with "roughly the same characteristics and features as

---

[1] Daniels also appears to argue that the line-up was suggestive as the police placed Daniels in the line-up wearing similar clothing as on the day of the incident—despite the victims failing to inform the police of the perpetrator's clothing—in an effort for O.R. to "identi[fy] clothing, not the suspect." (*Id.* at 12.)

the accused") (quoting *Williams v. Weldon*, 826 F.2d 1018, 1021 (11th Cir. 1987)).

For these reasons, the Court holds that the photographic line-up, under the totality of the circumstances, was not unduly suggestive. Moreover, the Court does not find that there is a "very substantial likelihood of irreparable misidentification" warranting exclusion of in-court identification. *See Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (holding that short of a "very substantial likelihood of irreparable misidentification" by an eyewitness, it is left to the jury to weigh the circumstances surrounding the eyewitness's observation of the crime). Therefore, the Court **denies** Daniels's motion to exclude. (**ECF No. 78**.)

### 3. *Cell Phone Search*

Last, Daniels argues that the police illegally searched the cell phone found at the crime scene before obtaining a search warrant, and therefore the contents of the cell phone and all derivative evidence must be excluded. (ECF No. 78 at 15.) The Government raises three arguments in response, contending that (1) Daniels has not established that he has standing to contest the search of the cell phone, (2) the cell phone was abandoned, and (3) the evidence derived from the warrantless search is admissible pursuant to the independent source doctrine. (ECF No. 92 at 9–21.) The Court need not determine whether Daniels has standing to challenge the search of the cell phone, as the Court finds that the cell phone was abandoned and that the police would have acquired the evidence in the cell phone via a lawful search pursuant to the independent source doctrine.

First, abandonment. To succeed on a Fourth Amendment claim, the defendant must show that there was "an invasion of the claimant's reasonable expectation of privacy" and that the challenged search or seizure was "unreasonable." *See U.S. v. Segura-Baltazar*, 448 F.3d 1281, 1285 (11th Cir 2006) (quoting *U.S. v. Bachner*, 706 F.2d 1121, 1125 (11th Cir. 1983)). But an individual's reasonable expectations of privacy in property can be abandoned. *See U.S. v. McKennon*, 814 F.2d 1539, 1545 (11th Cir. 1987) ("Legitimate expectations of privacy can be abandoned."). Abandonment is an objective standard, and the "critical inquiry is whether the person prejudiced by the search voluntarily discarded, left behind, or otherwise relinquished his [or her] interest in the property in question so that he [or she] could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *See id.* at 1545–46 (cleaned up).

Here, the cell phone was left at the crime scene. Daniels did not reside at the crime scene; rather, the tow yard is a private business on which Daniels was allegedly trespassing during the crime and to which it was unlikely that

Daniels planned to return. *See U.S. v. Walker*, 199 F. App'x 884, 886 (11th Cir. 2006) (holding that as the defendant knew police would be looking for him at an apartment complex, the evidence "strongly supports the inference" that the defendant did not intend to return to property left in the apartment complex parking lot). Moreover, courts regularly find that defendants abandoned property dropped while fleeing a crime scene. *See California v. Hodari D*, 499 U.S. 621, 629 (1991) (holding that the defendant abandoned drugs that he dropped while fleeing); *U.S. v. Taylor*, 462 F.3d 1023, 1025–26 (8th Cir. 2006) (holding that the defendant abandoned a cell phone that he dropped in the street while fleeing). Therefore, Daniels abandoned any interest in the cell phone he had, and he cannot now claim a Fourth Amendment violation from a search of the phone.

In any event, the independent source doctrine also applies here. The "independent source doctrine" permits the introduction of evidence that was initially discovered during, or derived from, an unlawful search, but was later obtained independently from untainted, lawful activities. *See Murray v. U.S.*, 487 U.S. 533, 537 (1988). While the exclusionary rule normally operates to prevent the Government from "profit[ing] from its illegal activity," the independent source doctrine ensures that police are put in "the same position they would have occupied if no violation occurred[.]" *See id.* at 541–42.

The Court finds that the search warrant—obtained two days after recovery of the phone—was not tainted by the earlier warrantless search, to the extent that it was unlawful. Search warrants are tainted by earlier unlawful searches where the "decision to seek the warrant was prompted by what they had seen during the initial [unlawful] entry, or if information obtained during that entry was presented to the Magistrate and affected his [or her] decision to issue the warrant." *See id.* at 542; *see also U.S. v. Noriega*, 676 F.3d 1252, 1260 (11th Cir. 2012) (holding that courts must "excise from the search warrant affidavit any information gained during the arguably illegal initial entry and determine whether the remaining information is enough to support a probable cause finding").

Here, the cell phone was left at the crime scene and both victims present stated that it did not belong to them. Because of the undeniable potential that a search of the cell phone could produce useful information in the investigation, the Court finds that the Government's decision to obtain a search warrant was not influenced by any information initially found in the cell phone. Moreover, after review of the search warrant application, the Court finds that the Government did not present information learned during the initial search in order to obtain the search warrant. (*See* ECF No. 92-2.) Indeed, the Government did not reference the initial search of the cell phone or disclose the

contents discovered during the initial search. (*See id.*) Therefore, even if the Court held that the initial warrantless search of the cell phone was unlawful, the evidence obtained would not be subject to the exclusionary rule.

For these reasons, the Court **denies** the Defendant's motion to exclude. (**ECF No. 78**.)

### 4. Conclusion

The Court has considered Daniels's motions (ECF Nos. 70, 72, 75, 78)) as well as the Government's responses (ECF Nos. 88, 89, 92, 93). The Court also held an evidentiary hearing and heard oral argument from the parties. For the reasons set out above, the Court **grants in part** the Defendant's motion to sever (**ECF No. 70**), **denies** the Defendant's motion in limine to limit law enforcement identification testimony (**ECF No. 72**), **denies** the Defendant's motion in limine to exclude FDHSMV records (**ECF No. 75**), and **denies** the Defendant's motion to suppress and exclude (**ECF No. 78**).

**Done and ordered**, in chambers, at Miami, Florida, on March 25, 2022.

_____
Robert N. Scola, Jr.
United States District Judge